**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**,

v.

**BRANDON CARTER**,

Defendant.

Criminal No.   09-161

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

Pending before the court is a motion to suppress evidence (ECF No. 52) filed by

Defendant Brandon Carter ("Defendant" or "Carter") in the above-captioned case.   On May 12,

2009, a federal grand jury in the Western District of Pennsylvania returned a two-count

indictment charging Defendant with receipt and possession of child pornography in violation of

18 U.S.C. §§ 2252(a)(2) & 2252(a)(4)(B).  (ECF No. 1.)

On May 23, 2011, Defendant filed a motion to suppress evidence (ECF No. 52), arguing

that the government seizures of his computers and hard drive were conducted in violation of the

Fourth Amendment to the United States Constitution.  Defendant argues: (a) the seizures were

warrantless and none of the exceptions to the warrant requirement apply; (b) the government

kept the seized computers for an unconstitutionally unreasonable amount of time before

obtaining a warrant; (c) the seizures were conducted without probable cause; and (d) the later-

obtained search warrants were lacking in probable cause.  (ECF No. 52.)

Defendant also filed a motion to produce evidence under Federal Rules of Evidence

404(b) and 609 (ECF No. 51), and a motion for discovery (ECF No. 50).  The court held a

hearing on the pretrial motions on September 16, 2011.  During the hearing, the court granted in

part and denied in part Defendant's motion for discovery.  (Hr'g Tr. Sept. 16, 2011

("Transcript") (ECF No. 70) at 12.)   The court denied as moot Defendant's motion to produce

evidence under Rules 404(b) and 609.  (Id. at 16.)

The court heard testimony from three government witnesses: Agent Brian Morris

("Morris") of the United States Secret Service ("Secret Service"); Special Agent Mark Kernan

("Kernan") of the Secret Service; and former[1] Secret Service Special Agent Michael Radens

("Radens").  Defendant called his father, Laverne Carter ("Defendant's father" or "Carter's

father"), to testify at the hearing.

The parties filed proposed findings of fact and conclusions of law on December 28, 2011

with respect to Carter's motion to suppress.  (ECF Nos. 73 & 74.)  On February 3, 2012, the

court granted Carter leave to file a supplemental, post-hearing brief to address the applicability

of a recent Supreme Court decision[2] to this case.  (ECF no. 76)  Carter filed the supplemental

brief on February 13, 2012 (ECF No. 77), and the government responded on February 19, 2012

(ECF No. 78).   Upon consideration of the parties' submissions and the evidence and testimony

presented at the suppression hearing, the court makes the following findings of fact and

conclusions of law:

I.      **Findings of Fact**

1.      Officers from the Scott Township police department arrested Carter on May 13,

2008, in the Pittsburgh, Pennsylvania, area for counterfeiting and fraud-related activities.

(Transcript (ECF No. 70) at 82.)  Following his arrest, Carter was incarcerated from May 13,

---

[1] Radens was employed in 2008 as a special agent with the Secret Service at all times relevant to this opinion.
(Hr'g Tr. Sept. 16, 2011 ("Transcript") (ECF No. 70) at 80-81.)    At the time of the September 2011 suppression
hearing, Radens was in training for a position with the Department of Homeland Security.  (Id.)
[2] On January 23, 2012, in United States v. Jones, 132 S. Ct. 945 (2012), the Supreme Court held that a governmental
"installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements,
constitutes a 'search'" within the meaning of the Fourth Amendment to the United States Constitution. Id. at 949.

2008 until at least July 2008.  (Id. at 84.)

2.      Officers found counterfeit gift certificates and counterfeit currency in the back seat of Carter's car.  (Id.)  The gift certificates were made from VersaCheck paper stock. (Id. at 82-83.)  VersaCheck is a computer program often used by businesses; the licit purpose of VersaCheck is to allow a person to print his or her own checks.  (Id. at 83.)

3.      In early May 2008, the Scott Township police department sought assistance from the Secret Service to investigate Carter's alleged counterfeiting of Federal Reserve Notes.  (Id. at 82.)

4.      Radens was the Secret Service case agent assigned to the investigation.  (Id. at 81.)

5.      Radens was immediately interested in finding any computer belonging to Carter because (a) Carter was in possession of counterfeit currency and gift certificates when he was arrested, (b) the gift certificates were created using the VersaCheck computer program, (c) counterfeiters often use computers either to create or to research bills or gift certificates, and (d) gift certificate counterfeiters often use computers to obtain images of store logos and to conduct research of return policies at retail stores.  (Id. at 82-84.)

6.      At the time of his arrest, Carter shared a townhouse in Carnegie, Pennsylvania, with Stephanie Kennedy ("Kennedy"), his former girlfriend.[3] (Id. at 84-85.)  At all times relevant to this opinion, Kennedy was a member of the United States Air Force Reserve. (Id. at 85.)

7.      Carter had two computers at the townhouse.  One computer was a Gateway.  (Id. at 95.)  The other was an HP. (Id.)  The computers were in a common area, in an extra bedroom of the townhouse.  (Id. at 87.)  The bedroom was arranged to function as an office.  (Id.)

_____

[3] Carter and Kennedy were no longer dating at the time of his arrest, but were still sharing the Carnegie townhouse. (Transcript (ECF No. 70) at 85.)

3

Kennedy used the computers.  (Id.)  The office was filled with a "a lot of [other] computer equipment" beyond the two computers.  (Id.)  Kennedy saw gift certificates in the office near the printer.  (Id. at 115.)

8.      On the night that Carter was arrested, May 13, 2008, his stepbrother, Jack Brown ("Brown"), removed some of Carter's belongings (the identity of which are unknown) from the townhouse.  (Id. at 111.)

9.      On May 28, 2008, Carter's probation officer told Radens that on the night of Carter's arrest Brown removed many belongings from the townhouse.  (Id. at 107-08.)

10.     On June 1, 2008, while Carter was still incarcerated, Kennedy was evicted from the townhouse.  (Id. at 87, 138.)  Kennedy removed all items from the residence, including Carter's computers and other belongings.  (Id. at 113, 138.)  Kennedy took Carter's belongings (including the Gateway and HP computers) to Carter's parents' house (the "Carter house") in the Pittsburgh, Pennsylvania, area, and left them on the deck at the back of the house.  (Id. at 114, 145.)  The next day, Carter's father moved the computers to the basement.  (Id. at 145.)  Kennedy believed that she had returned all of Carter's belongings to his parents.  (Id. at 114.)

11.     On June 6, 2008, Carter's landlord told Radens that Kennedy had moved out of the apartment with all of Carter's remaining belongings.  (Id. at 113.)  The landlord told Radens that she believed Kennedy had given the computer to Carter's parents.  (Id.)

12.     On the morning of June 11, 2008, Radens and Kernan interviewed Kennedy at the 911th Air Force Reserve base in Moon, Pennsylvania.  (Id. at 85, 113, 118.)  Kennedy confirmed she had given the computers to Carter's parents, along with the rest of his property.  (Id. at 113.)  Kennedy also told Radens and Kernan that "she had knowledge of the gift certificates and had seen them in the office [of the townhouse] . . . near the printer."  (Id. at 115.)

13.     The night before his conversation with Kennedy, Radens took notes about the information obtained during the investigation, in preparation for completing an affidavit for a search warrant the next day.  (Id. at 117.)   The same night, June 10, 2008, Radens told Morris not to report to their office in the morning, but to head straight for the Carter house to surveil it. (Id.)  Radens wanted Morris to prevent anyone from removing the computers from the Carter house.  (Id.)  Although Kennedy was very cooperative with investigators, Radens did not interact with her prior to June 11, 2008, and he was concerned she might inform Carter's parents that Secret Service agents were asking about the computers.  (Id. at 88-89, 117.)

14.     The June 11, 2008 interview with Kennedy ended at approximately 10:00 a.m., following which Radens and Kernan headed directly to the Carter house in the same car.  (Id. at 118.)  They arrived and met Morris about fifteen minutes later.  (Id.)

15.     Morris was surveilling the Carter house in a car parked on the road approximately 200 or 300 away from the driveway to the Carter house.  (Id. at 35, 89.)  Radens parked in the driveway of the Carter house.  (Id. at 89.)  Morris moved his car to the driveway when Radens and Kernan arrived.  (Id. at 36.)

16.     Radens planned to attempt to obtain possession of the computers by the consent of one of Carter's parents, before going through the process of applying for a warrant.  (Id. at 115.)

17.     After Radens and Kernan arrived at the Carter house, the three agents attempted to initiate contact with Carter's parents.  (Id. at 88-89.)  Radens and Morris approached the front door and Radens knocked on it.  (Id. at 90.)  Kernan went to the rear of the house, knocked on a rear window, and looked through the window to see if anyone was home.  (Id. at 56.)  Morris moved to the side of the house to watch for anyone attempting to leave.  (Id. at 23.)  No one

answered the front door or responded to the knocking on the rear window; Kernan did not see anyone through the rear window.  (Id. at 56, 90.)

18.     The agents were wearing slacks and button-up shirts while at the Carter house; they wore the shirts untucked to cover their firearms, badges and handcuffs.  (Id. at 25-26.)

19.     When no one responded to the knocking, Radens called Defendant's mother, Rochelle Carter ("Carter's mother" or "Defendant's mother"), on the telephone.  (Id. at 90.) Radens told Carter's mother that he believed the computers were in the house, and asked that she give them to the agents.  (Id. at 90.)  Defendant's mother initially denied that the computers were in her house.  (Id. at 92.)  Radens and Carter's mother spoke two or three times that morning on the phone.  (Id.)  During the second or third conversation, only after Radens told Carter's mother that he would get a warrant if she did not consent, she told him she would turn the computers over to the agents after her work ended at 5:00 p.m.  (Id. at 92, 120.)

20.     Because Radens was concerned that waiting until 5:00 p.m. might facilitate the destruction of evidence on the computers, he left the Carter house to obtain a search warrant. (Id. at 121.)  Before leaving, Radens instructed Kernan and Morris to watch the house and to "do their best" to prevent the removal of evidence from the house.  (Id. at 123.)  He did not specifically tell them to reinitiate a consent search of the house.  (Id. at 124.)  He instructed them not to let anyone into the house, so that no one could access or destroy the computers.[4]  (Id. at 93.)  Radens needed to return to the office to complete a supporting affidavit for a search warrant.  (Id. at 93-94.)  He only needed to add the information obtained from Kennedy that morning during her interview because he wrote most of the affidavit the night before.  (Id.)

21.     After Radens left the Carter house, Carter's father came out of the residence and

---

[4] The instruction not to let anyone into the house appears to have been based on Radens's false assumption at the time that there was no one *already* inside the house, because no one had responded to the agents' knocking.

explained to Morris and Kernan that he worked the midnight shift and was sleeping earlier when they knocked.  (Id. at 27.)  Morris explained the nature of a consent search and the terms of the consent form he had prepared for Defendant's father to sign.  (Id. at 28-30.)  Carter's father told Morris that the computers were downstairs in the basement in a box; the agents reassured him that they would not be doing a complete search of the residence.  (Id. at 28.)  Carter's father read and signed the consent form,[5] Kernan gave him a property receipt, and the agents removed the two computers.  (Id. at 25, 27, 31.)  After securing the computers, Morris and Kernan left the Carter house, approximately thirty or thirty-five minutes after Carter's father came to the door. (Id. at 31.)

22.     While Radens was driving to the office, Kernan phoned him.  (Id. at 94.)  Kernan told Radens that Carter's father had consented to turn over the computers.  (Id.)  As Radens was walking into his office to complete the affidavit, Kernan called him a second time to tell him the

---

[5] The consent form provided:

> I, **Lavern Carter**, have been informed of my constitutional right not to have a search made of the premises and/or automobile mentioned without a search warrant.  I have also been informed of my right to refuse to consent to such a search.  However, I hereby authorize **SA B. R. Morris** and **SA M. Kernan**, **US Secret Service** to conduct a ~~complete~~ search of the **garage** premises ~~and/or automobile~~ at **[address redacted]**.  These (officers or agents) are authorized by me to take from the premises ~~and/or automobile~~ any letters, papers, materials or other property which is contraband or evidence in the nature of **CFT Obligation/computer**.  I understand that this contraband or evidence may be used against ~~me~~ in a court of law.
>
> This written permission is being given by me to the above named persons voluntarily and without threats, duress, or promises of any kind.  I understand that may ask for and receive a receipt for all things taken.

(Consent to Search Form, Gov't Ex. 1, Hr'g Sept. 16, 2011 (handwritten portions in bold; stricken portions indicated with strikethrough).)  Carter's father testified at the suppression hearing that he was told by agents that they had a search warrant for the house, which he believed was the document he signed, but he also stated that the agents told him they would have to leave the house to obtain a search warrant.  (Transcript (ECF No. 70) at 148-50.)  Morris testified that he never discussed applying for a search warrant with Carter's father.  (Id. at 31.)  Carter's father testified that the agents said they would not "tear [his home] up" if he took them straight to the computers.  (Id. at 140.)  He also testified that agents never told him he could refuse them access to his home.  (Id. at 149-50.)  He remembered the agents telling him if he "didn't consent with them, I could get in a lot of trouble or something, something of that sort."  (Id. at 150.)   The court credits the testimony of Morris and does not fully credit the testimony of Defendant's father.

agents were in possession of the computers.  (Id.)  At that point, Radens ceased his attempt to complete the affidavit.  (Id.)

23.    On June 11, 2008, Carter spoke with his mother by telephone from jail.  (June 23, 2008 Search Warrant (ECF No. 52-1) at 9.)  He told her that the agents would not find images of counterfeit money on the computers, because he went through the computers to ensure no images were saved.[6]  (Id.)

24.    On June 23, 2008, a judge signed a search warrant authorizing the search of both computers found at the Carter house for evidence of counterfeiting.[7]  (Id.)

---

[6] According to the search warrant affidavit, "[a]ll inmates are advised that phone calls made from the jail are consenting to the monitoring, or recording of there (*sic*) conversations."  (June 23, 2008 Search Warrant (ECF No. 52-1) at 9.)

[7] The affidavit filed by Radens in support of the June 23, 2008 search warrant contained the following averments:

> I, Michael P. Radens, being duly sworn depose and state:
>
> 1.    I am currently employed as a Special Agent with the United States Secret Service. I have been so employed for approximately twenty three months. As a Special Agent with the Secret Service, I have the responsibility of investigating violations of the federal laws related to manufacturing, sale and possession of counterfeit currency, as well counterfeit securities of organization involved in interstate commerce. See 18 U.S.C. §§ 471, 472, 473 and 513(a).
>
> 2.    I am submitting this affidavit in support of a search warrant for Brandon Carter's personal computers. The computers are described as one (1) HP computer tower, serial number CN239B7224; and one (1) Gateway computer tower, serial number XGM7A21 000788. These computers are currently located at the Pittsburgh Field Office of the United States Secret Service, at two Chatham Center, Suite 1610, 112 Washington Place, Pittsburgh, Pennsylvania.
>
> 3.    The information set forth below was obtained by me from personal observation, through participation in the investigation, conversations with other federal, state and local law enforcement officers, conversation with cooperating witnesses, and from reviewing reports prepared by other law enforcement agents.
>
> 4.    For the following reasons, I have probable cause to believe that currently located on Brandon Carter's two computers is evidence of violations of Title 18, United States Code, Sections 471, 472, and 473 and 513(a).
>
> 5.    05/13/2008 Brandon Carter was arrested by Pltm. Shawn Arlet, Scott Township Police Department. Carter was arrested for an outstanding

warrant issued on 5/4/2008 by the Pittsburgh Magistrate Court, Commonwealth of Pennsylvania.

6. During the arrest on 05/13/2008 Ptlm. Arlet was forced to remove Carter from the vehicle after Carter reached in his glove box for what appeared to be a firearm. The weapon was later found to be a C02 SB gun.

7. After Cater was placed under arrest Ptlm. Arlet began to inventory the vehicle prior to the vehicle being impounded. Carter had stated that the car contained several valuable items.

8. In the backseat of the vehicle Ptlm. Arlet found a plastic bag with what appeared to be some cut and uncut counterfeit $100 federal reserve notes (FRN's), as well as what appeared to be several $500 gift certificates from Lowes and Wal-Mart retail stores. Arlet stopped the search and obtained a search warrant to complete the search of the vehicle. Ptlm. Arlet obtained nineteen (19) counterfeit $100 FRN's and four (4) counterfeit gift certificates worth $2,000.00. Two (2) of the certificates were for Lowes Retail stores and two (2) of the gift certificates were for Wal-Mart retail stores. Both the counterfeit FRNs and the counterfeit gift certificates appeared to be computer generated.

9. The arrest warrant was obtained by City of Pittsburgh Police Ptlm. Michael Mares. The arrest warrant was obtained for violations of 18 Pa.C.S.A. §§ 3922(a)(1) (theft by deception), 4106 (a)(2) (access device fraud), and 903(a)(1) (criminal conspiracy).

10. On 04/21/2008 Mares responded to a Kmart retail store located at [address redacted]. Mares stated that two individuals entered the Kmart and each passed (1) one $500 counterfeit gift certificates for various electronic equipment totaling $1,000 in loss to the store.

11. [Someone in the store identified Carter as one of the individuals]

12. Mares stated that two hours later that same day, the same unknown individual returned some items purchased with the counterfeit gift certificates at the Bridgeville, PA Kmart store for cash. Mares stated that after [a second witness] identified Carter from a photo line-up he obtained an arrest warrant for Carter.

13. After Carter's arrest Scott Township Ptlm. Arlet advised the writer that several Lowes retail stores, as well as Wal-Mart retail stores in the Pittsburgh area and its surrounding communities have been victims of the same counterfeit gift certificates found in Carter's possession. The Lowes and Wal-Mart counterfeit gift certificates are identical to the Kmart counterfeit gift certificates, but all bear the individual stores logo.

14. The writer has obtained approximately thirteen (13) counterfeit gift certificates worth $6,500 from different stores in the Pittsburgh area. All of the gift certificates the writer has obtained are printed on check stock; all have the same directions for the store clerks to tender the gift certificate as cash and each check bears the logo of the store for which it was it was attempted to be passed. All of the gift certificates obtained match certificates found on Carter the day of his arrest.

15. Carter has an extensive criminal history for passing counterfeit FRN's. Carter was on house arrest for the use of counterfeit currency after he was arrested by the Scott Township Police Department. On three separate occasions Carter has been arrested for purchasing vehicles with counterfeit checks. In 2004 Carter was incarcerated for passing counterfeit checks. Carter has also been arrested in the past for the use of a stolen access device.

16. On *06/06/2008* the writer contacted Carters ex-landlord Dana Esper. Esper stated that Carter's friend "PJ" emptied Carter's apartment the night of his arrest. Esper described "PJ" as a black male with tattoos on is neck, and dread locks or braids in his hair. "PJ" was later identified as Jack Brown Jr. Esper also stated that Brown did not take Carter's computers. Esper stated that the computers remained at the apartment until Carter's girlfriend, Stephanie Kennedy, was evicted. Esper also stated that Kennedy gave both computers to Carter's mother Rochelle or "Shelly". Dana stated that Kennedy is currently residing at the 911th Air Force base located in Moon, PA.

17. On 06/11/2008 Special Agent Kernan and the writer interviewed Stephanie Kennedy. Kennedy stated she had dropped off all of Brandon Carter's computer equipment at his mother's house on June 1, 2008 after being evicted from the apartment she shared with Carter. Kennedy stated Carter's computers were left on the back porch of Carter's mother's residence. Kennedy gave a description of the computers.

18. Kennedy stated she found a counterfeit gift certificate on the floor in Carter's office worth $500 after he was arrested on 05/13/2008. Kennedy stated it was in the same room Carter's computers were located. Kennedy stated that she got rid of the gift certificate in the trash, and that she could not remember what store the certificate was for. The writer showed Kennedy an image on his cell phone of a counterfeit gift certificate obtained from Officer Matt Kaminski, Tarentum Police Department. This is the counterfeit gift certificate Brandon Carter passed at the Pittsburgh Mills Wal-Mart on 5/13/2008. The writer is in possession of the surveillance footage of Carter passing the counterfeit gift certificate, as well as the original counterfeit gift certificate. Kennedy stated that the counterfeit gift certificate she found in Carter's office looked like the counterfeit gift certificate shown to her by the writer.

19. On 06/11/2008 the writer interviewed Rachael Carter telephonically. Rachael Carter denied that her son Brandon Carter's computers were at her residence located at 1507 Laurel Ridge Drive, Crescent Township, PA. Rachael Carter stated she only had Carter's clothing, no computers. After the writer stated he was going to obtain a warrant to search the residence Rachael Carter stated that she would provide the writer with the computers·once she arrived at home that evening.

20. After the conversation with Rachael Carter, Lavern Carter, Rachael Carter's husband, the owner of 1507 Laurel Ridge Drive, Crescent Township, PA consented to a search of the residence. Lavern Carter led Agents to Brandon Carter's computer equipment. The equipment matched the description Stephanie Kennedy gave of the computers. The equipment was taken to the U.S. Secret Servic [*sic*] evidence locker located at the Pittsburgh Field Office.

25.     After obtaining the warrant, the agents discovered that the hard drive was missing from the HP computer; Radens contacted Kennedy to ask if she had the hard drive.  (Transcript (ECF No. 70) at 98.)  Kennedy, who was deployed with the Air Force at the time, told Radens that she did not know if it was in her possession, but that she would contact her current boyfriend and ask him to look through her belongings.  (Id. at 99.)  Kennedy later contacted Radens to inform him that her boyfriend had found a hard drive in her belongings and had sent the hard drive to the Secret Service.  (Id.)  Radens received a Western Digital hard drive from Kennedy on July 23, 2008.  (Id. at 99-100.)

26.     The Gateway computer's hard drive was imaged on June 25, 2008.  (Id.)  During the search of the computer for evidence of counterfeiting, evidence of child pornography was found; the search of the computer was halted in order for the agents to obtain a second search warrant to look for child pornography on the Gateway computer. (Id. at 100-102; June 23, 2008 Search Warrant (ECF No. 52-1) at 2; Aug. 7, 2008 Search Warrant (ECF No. 52-2) at 2.)

27.     Agents obtained a second search warrant on August 7, 2008 to permit the search of the Gateway computer for child pornography.[8]  (Aug. 7, 2008 Search Warrant (ECF No 52-2)

---

21. On 06/12/2008 the writer obtained recorded telephonic conversations from Brandon Carter who is currently incarcerated at the Allegheny County Jail, and his mother Rachael Carter that took place on 6/11/2008, the day Carter's computers were taken. All inmates are advised that phone calls made from the jail are consenting to the monitoring, or recording of there conversations. During the conversations Carter stated that the Secret Service will not find any images of counterfeit money. Carter states that he went through the computer to ensure no images were saved.

(June 23, 2008 Search Warrant (ECF No. 52-1) at 4-9.)  Due to the nature of counterfeiting and computer-based evidence, the affidavit included generalized averments about the likelihood of finding evidence of counterfeiting crimes on a computer.  (Id. at 9-11.)  Radens summarized the types of evidence he believed he had probable cause to find on the computers (the affidavit was written before the agents discovered that the HP computer was missing its hard drive).

[8] The affidavit for the second warrant (to search the Gateway for child pornography) referred to four file names found on Carter's shared folder for the peer-to-peer file-sharing network LimeWire.  All four file names indicated that the files contained images of individuals who were between the ages of seven and sixteen engaging in sexual acts.  For example, one file name is "Preteen Asian ALICA, 11 yo Philippine (Filipina) child prostitute XXX HC

at 2.)

28.     After agents discovered pornographic videos of children and evidence of

counterfeiting on the Gateway computer, they obtained a third search warrant on August 21,

2008.  The third search warrant permitted them to search the Western Digital hard drive for

evidence of counterfeiting and child pornography.[9]  (Aug. 21, 2008 Search Warrant (ECF No.

52-3) at 2.)


## II.     Conclusions of Law

### Burden of Proof

29.     Defendant has the burden of demonstrating that a warrant is invalid.  United

States v. Longmire, 761 F.2d 411, 417 (7th Cir. 1985) ("Where the police have acted pursuant to

a warrant, the independent determination of probable cause by a magistrate gives rise to a

presumption that the arrest or search was legal.")  The government has the burden of

demonstrating that an exception to the warrant requirement applies.  United States v. Herrold,

962 F.2d 1131, 1137 (3d Cir. 1992).

---

pedo ptsc.mpg." (Aug. 7, 2008 Search Warrant (ECF No. 52-2) at 5.)   Another contained the phrase "7 yo and 10
yo 69 pedo child porno Lolita." (Id.)   The affidavit also indicated that there were other file names on the computer,
beyond the four examples, containing terms such as "lolita" that are often associated with child pornography.  (Id. at
5-6.)
[9] The affidavit in support of the third warrant (to search the HP hard drive for child pornography and evidence of
counterfeiting) explained the circumstances surrounding: (a) the investigation of Carter; (b) the finding of child
pornography and evidence of counterfeiting on the Gateway computer; and (c) the sending of the hard drive to the
Secret Service:

> On 07/19/2008 Stephanie Kennedy, Brandon Carter's ex-girlfriend contacted me
> telephonically.  Kennedy was interviewed by Agent Kernan and me concerning
> the missing hard drive from Brandon Carter's HP computer serial number
> CN239B7224.  Kennedy contacted me to advise that she located the missing
> hard drive.  Kennedy stated that one of her friends found the hard drive in her
> personal storage space.  Kennedy stated that she would have the hard drive
> mailed to me.  On 07/23/2008 the Western Digital Hard drive serial number
> WCAM9M749827 arrived via U.S. Mail at the United States Secret Service
> Pittsburgh Field Office.

(Aug. 21, 2008 Search Warrant (ECF No. 52-3) at 5-7.)

30. Defendant filed a motion to suppress the evidence obtained from the searches of the Gateway computer and Western Digital hard drive. (ECF No. 52.)

31. Defendant argues that: (a) the three search warrants for the computers and hard drive were lacking in probable cause; (b) the seizures were conducted without probable cause; (c) the seizures of the computers and hard drive were warrantless and none of the exceptions to the warrant requirement apply; and (d) the government kept the seized computers for an unconstitutionally unreasonable amount of time before obtaining a warrant. (ECF No. 52.)

32. The government does not dispute that the June 11, 2008 seizure of Carter's computers and the seizure of the Western Digital hard drive were warrantless, but argues that several exceptions to the warrant requirement or the exclusionary rule render the search reasonable or preclude suppression of the evidence obtained from the computers and hard drive (the "disputed evidence").

**The Warrants and Probable Cause**

33. As an initial matter, the defendant's argument that the three warrants lacked probable cause is without merit.

34. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubbs, 547 U.S. 90, 96 (2006) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Probable cause determinations require the magistrate judge to make a "practical, common-sense decision." Gates, 462 U.S. at 238.

35. The role of a reviewing court is not to review the magistrate judge's decision *de novo* but to determine whether "'the magistrate had a substantial basis for concluding that

probable cause existed.'" <u>United States v. Stearn</u>, 597 F.3d 540, 554 (3d Cir. 2010) (quoting

<u>Gates</u>, 462 U.S. at 238). This is a deferential standard of review. <u>Id.</u> "Doubtful or marginal

cases in this area should be largely determined by the preference to be accorded to warrants."

<u>Gates</u>, 462 U.S. at 237 n.10.

      36.      The court will separately consider each warrant.

      37.      The application submitted by Radens for the first warrant, dated June 23, 2008,

for the search of the two computers, contains a surplus of evidence to indicate that Carter was

using his computers for illicit counterfeiting activities, and the magistrate judge had a substantial

basis for concluding that Carter used his computers for counterfeiting. In that application,

Radens reviewed: (a) Carter's history of counterfeiting; (b) the physical evidence showing Carter

produced the gift certificates using the VeriSign computer program; (c) statements from

Kennedy that she had seen a counterfeit gift certificate in Carter's office near the computers; and

(d) Raden's knowledge and experience that computer-based evidence is often important and

abundant in counterfeiting investigations. Given the facts enumerated in the application, the

court determines that the magistrate judge had a substantial basis to conclude that there was a fair

probability that Carter's computers would contain evidence or contraband relating to the

counterfeiting,

      38.      The application submitted by Radens for the second warrant, dated August 7,

2008, allowing the search of Carter's Gateway computer for evidence of child pornography,

likewise contained sufficient evidence for the magistrate judge to conclude that there was a fair

probability that evidence of child pornography would be found on the computer. In that

affidavit, Radens identified four file names found on Carter's shared folder for the peer-to-peer

file-sharing network LimeWire. All four file names indicated that the files contained images of

minors engaged in sex acts. The file names essentially explained that the files contained sexually explicit content involving children, and the magistrate had no reason to doubt the names accurately described the content of the file. The court determines that the magistrate judge had a substantial basis to conclude that there was a fair probability that Carter's Gateway computer would contain child pornography. See United States v. Stabile, 633 F.3d 219, 242-44 (3d Cir. 2011) (holding that a police officer's observation of lurid file names, which were in plain view, provided probable cause for a warrant to search the hard drive for evidence of child pornography); United States v. Miknevich, 638 F.3d 178, 184-85 (3d Cir. 2011) (holding that a computer file name may not provide sufficient grounds for probable cause where it contains a "commonplace" term or is "otherwise capable of different interpretations," but that it may be considered a logical indication of the file's contents when it is detailed and explicit enough to permit a reasonable inference of the content of the files).

39. The application submitted by Radens for the third warrant, dated August 21, 2008, permitting the search of the Western Digital hard drive for evidence of child pornography and counterfeiting, also contained sufficient evidence for a magistrate judge to find probable cause. In that application, Radens explained: (a) Carter's Gateway computer contained child pornography and at least one image of a counterfeit gift certificate, (b) the Western Digital hard drive probably belonged to the HP computer, (c) the hard drive had a partially known chain of custody, and (d) the HP computer and Gateway computer were situated near each other in Carter's office. Under these circumstances, the magistrate judge had a substantial basis fairly to infer that evidence of child pornography and counterfeiting would probably be found on the Western Digital hard drive.

**Staleness**

40.     Defendant argues that the evidence described in the warrant applications was stale by reason of the passage of time between the applications and the evidence cited in support of probable cause.  "The concept of staleness is important in determining probable cause for a search."  United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983).  In "[a]n application for a search warrant . . .  it is necessary to establish that certain items are probably located at the present time in a certain place."  Id.   "It is not enough that the items may have been at the specified location at some time in the past—there must be probable cause to believe that they are there when the warrant issues."  Id. (citation omitted).  "The likelihood that the evidence sought is still in place depends on a number of variables, such as the nature [1] of the crime, [2] of the criminal, [3] of the thing to be seized, and [4] of the place to be searched."  Id.

41.     Applying the deferential standard of review to the magistrate judges' decisions, and the four factors from Tehfe, the evidence in the warrant applications was not stale.  It was reasonable to conclude that the evidence would still be on the computers because (a) Carter did not have access to the computers after his incarceration and (b) computer evidence is particularly difficult fully to eradicate and does not readily dissipate by natural means.  See United States v. Vosburgh, 602 F.3d 512, 529 (3d Cir. 2010) (considering staleness analysis with respect to computers and computer equipment).  In Vosburgh, the court of appeals recognized it was "obvious" that computer evidence does not "rapidly dissipate[] or degrade[]" and is not usually "quickly or continuously discarded."  Id.   The court concluded that "the passage of weeks or months [when considering computer evidence] is less important than it might be in a case involving more fungible or ephemeral evidence, such as small quantities of drugs or stolen music [CDs]."  Id. (citing United States v. Ritter, 416 F.3d 256, 270-71 (3d Cir. 2005) (Smith, J.,

concurring) ("It is well-established that staleness is a contextual inquiry and not simply a matter of measuring the age of information contained in an affidavit. . . . For instance, information regarding an alleged burglar possession of readily fenced music CDs will dissipate faster than, say, an alleged burglar's possession of a stolen Cezanne painting that may take the suspected thief years to unload.")).  The reasoning in <u>Vosburgh</u> applies in this case.  The facts in this case are even more compelling because the government's possession of the computers for much of the time period diminishes any remaining doubt about its staleness, as does the storage and non-use of the computers for much of the time before their seizure.[10]

### Alleged False Statements in the Third Warrant

42.     Defendant argues that the third warrant must be suppressed because it was issued "based upon a false statement of material fact in Agent Radens's supporting affidavit." (Def.'s Proposed Findings of Fact & Conclusions of Law (ECF No. 73) at 69-70.)

43.     Under <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978), when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood by supplying the omitted information to the original affidavit, and subsequently determining if the affidavit with the added information contains sufficient probable cause.  <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 401 (3d Cir. 1997).

---

[10] In <u>Vosburgh</u>, the court of appeals held that a February 23, 2007 search warrant application was not stale although it relied primarily on evidence that the defendant, on October 25, 2006, attempted to download a "dummy" child pornography file posted by an FBI agent in an online forum.  602 F.3d at 517-19.  There, the computer had remained in the defendant's custody (and presumably was in use) for the entire four-month period after the download and before the application for a warrant.  <u>Id.</u>

44.     Defendant argues that Radens's supporting affidavit for the third warrant was materially false because Radens averred that Kennedy told him "she located the missing hard drive." See supra note 7.  Defendant argues that Radens's testimony at the suppression hearing to the effect that (a) Kennedy could not identify that the hard drive belonged to the HP computer and (b) she did not herself discover the hard drive, establishes that that his affidavit contained a material falsity.  Radens, however, averred in the affidavit that "Kennedy stated that one of her friends found the hard drive in her personal storage space" and that "Kennedy stated that she would have the hard drive mailed to me." (Aug. 21, 2008 Search Warrant (ECF No. 52-3) at 5-7.)  Because the affidavit clearly states that Kennedy did not claim to have personally found the hard drive, there is no falsity in the affidavit in that respect.

45.     The failure to state that Kennedy could not identify the hard drive as specifically belonging to the HP computer is an omission because the affidavit omits that fact.  Following the Sherwood approach, the court will supply the omitted information to the affidavit.  The court must determine whether the affidavit would have contained sufficient probable cause if it had included a statement that "Kennedy could not confirm that the hard drive found in her belongings was the same hard drive that was missing from Carter's HP computer."  Even if the magistrate judge considered this statement in the warrant application, there would have been a fair probability that the hard drive found in Kennedy's stored belongings, which she had removed from the townhouse she shared with Carter, belonged to the HP computer. "Doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Gates, 462 U.S. at 237 n.10.  The practical or common-sense inference drawn from all the facts presented in the supporting affidavit for the third warrant is that the hard drive found in a storage unit with one roommate's possessions was the same hard drive missing from another

roommate's computer, after the two roommates had been evicted from a shared residence. Common sense leads one to conclude that Kennedy mistakenly placed the hard drive in storage with her belongings when she was moving out instead of dropping it off at Carter's parents' house with the rest of his belongings, and that it remained in storage until it was discovered. Because the omission is not material to the finding of probable cause, and because the affidavit was not false with respect to who discovered the hard drive, <u>Franks</u> does not mandate exclusion in this case.

46.     Because there are no <u>Franks</u> issues, the search warrants were not stale, and all three warrants, after applying the deferential standard of review, contained sufficient probable cause, the motion to suppress (ECF No. 52) must be denied on these grounds.

47.     The court will next consider whether to exclude evidence obtained as the result of the arguably illegal seizures of Carter's computers and hard drive.

**The Exclusionary Rule and the Seizure of the Computers**

48.     There were a number of issues raised by Defendant with respect to whether the seizure of Carter's computer equipment by Secret Service agents was illegal and unreasonable under the Fourth Amendment.   Because the independent source doctrine exception to the exclusionary rule is applicable to this case, the court for the sake of brevity will assume, without deciding the merits, that the seizure of Carter's computers violated the Fourth Amendment, and the third-party consents of Carter's father (with respect to the Gateway computer) and Kennedy (with respect to the Western Digital hard drive) were defective.   Thus, this opinion will address only whether the independent source doctrine exception to the exclusionary rule applies.[11]

---

[11] Because the court is presuming, without deciding, that the seizure of Carter's property violated the Fourth Amendment, the court need not address the arguments raised by Defendant in his supplemental brief on the

49.     "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984).

50.     The proper test for exclusion of evidence is "whether, granting the establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). The fruit of the poisonous tree doctrine does not permit exclusion of evidence "simply because 'it would not have come to light but for the illegal actions of the police.'" Segura, 468 U.S. at 815 (emphasis added) (quoting Wong Sun, 371 U.S. at 487-88).

51.     In this case, the disputed evidence—the child pornography found on the computers—would not have come to light in precisely the same causal sequence but for the initial seizure of the computer by the Secret Service agents, which for the purposes of this analysis is assumed to have violated the Fourth Amendment. There is no evidence, however, that the seizure was exploited by police to obtain the evidence.

52.     An illegal seizure does not automatically result in the exclusion of all evidence obtained after the seizure. There are several exceptions to the exclusionary rule, which are used to distinguish situations where the government obtained evidence by exploitation of an illegal search from situations where the evidence was sufficiently attenuated from the taint of the search.

53.     One exception to the exclusionary rule is the independent source doctrine. The

applicability of United States v. Jones, 132 S. Ct. 945 (2012), all of which deal with the threshold question whether the searches violated the Fourth Amendment, and none of which impact the applicability of the independent source doctrine, which is dispositive in this case. (See Def.'s Reply Br. Further Supp. Mot. Suppress (ECF No. 77).)

independent source doctrine "permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." United States v. Price, 558 F.3d 270, 281 (3d Cir. 2009) (quoting Murray v. United States, 487 U.S. 533, 537 (1988)). Evidence obtained from a source independent of the illegal seizure is not excluded because

> the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

Nix v. Williams, 467 U.S. 431, 443 (1984).

54.     Another exception to the exclusionary rule is the inevitable discovery doctrine, which prevents exclusion of evidence if the government can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means. United States v. Vasquez de Reyes, 149 F.3d 192, 195 (3d Cir. 1998).

55.     In United States v. Herrold, the Court of Appeals for the Third Circuit explained the distinction between the independent source doctrine and the inevitable discovery doctrine:

> [U]nder the independent source doctrine, evidence that was in fact discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible. In contrast, the inevitable discovery doctrine . . . permits the introduction of evidence that inevitably would have been discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful. The independent source and inevitable discovery doctrines thus differ in that the former focuses on what actually happened and the latter considers what would have happened in the absence of the initial search.

962 F.2d 1131, 1140 (3d Cir. 1992). "Typically these so-called independent source doctrine

cases involve an illegal search and discovery of evidence followed by a second search conducted after a warrant is obtained." Budd, 549 F.3d at 1147 (citing Murray v. United States, 487 U.S. 533, 535-36 (1988)) (applying the independent source doctrine in a case where a "presumptively illegal seizure of [a] computer [was] followed by a search of the computer conducted pursuant to a warrant").

56.     This case involves the independent source doctrine, not the inevitable discovery doctrine. Like Budd, assuming there was an illegal seizure of the computer, the seizure was followed by a search pursuant to warrants. The searches that actually led to the discovery of the disputed evidence were the forensic searches of the computers, not their initial seizure. The court is not asking whether the agents would have inevitably discovered the evidence on the computers if not for the initial seizure, but instead whether the later, valid searches of the computers (which "actually happened," see Herrold, 962 F.3d at 1140) were sufficiently independent from the earlier allegedly illegal seizure of the computers to preclude excluding the disputed evidence.

57.     In applying the independent source doctrine, the court must ask "'(1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search . . . prompted the officers to obtain the [subsequent] search warrant.'" Stabile, 633 F.3d at 243 (quoting Herrold, 962 F.2d at 1144). "'If the answers to these questions are yes and no respectively . . . then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible." Id. at 243-44. The burden of proof is on the government. Herrold, 962 F.2d at 1137.

**Would a neutral justice have issued the search warrant?**

58.     The answer to the first question is "yes."  None of the three warrant applications contained information obtained during the unlawful seizure, and the court already determined that the applications supporting the three warrants provided sufficient probable cause for a magistrate judge to issue those warrants.

59.     Defendant argues that the first warrant, dated June 23, 2008 and permitting the search of both the Gateway and HP computers for evidence of counterfeiting, would have lacked particularity if not for the serial numbers of the computers which were only obtained as a result of the presumptively illegal seizure.  With respect to particularity, the Fourth Amendment to the United States Constitution directs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly* describing the place to be searched and the person or things to be seized."  U.S. CONST. amend. IV.  The particularity requirement functions as a prohibition of overbroad general warrants which "essentially authorize 'a general exploratory rummaging in a person's belongings.'"  United States v. Yusuf, 461 F.3d 374, 393 (3d Cir. 2006) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)); accord United States v. Leveto, 540 F.3d 200, (3d Cir. 2008) ("A warrant is not general unless it can be said to vest the executing officer with unbridled discretion to conduct an exploratory rummaging through defendant's papers in search of criminal evidence." (internal quotations omitted)).   To determine if a warrant was overbroad, the court must compare the scope of the search authorized by the warrant with the ambit of probable cause established by the supporting affidavit.  In re Impounded Case (Law Firm), 840 F.2d 196, 200 (3d Cir. 1988).   Here, even after excising the serial numbers from the warrant and application which defendant argues is tainted by the presumptively illegal seizure, the warrant contains sufficient particularity to overcome a

challenge of overbroadness. The warrants were clearly directed at the two computers seized by agents from the Carter house. The warrant did not need to contain the serial numbers of the computers in order to reference clearly, specifically and exclusively that it applied to the two computers owned by Carter and left at his parents' home after his arrest. The first search was limited to evidence of counterfeiting, and after agents found evidence of child pornography, they ceased the search and obtained a second and third warrant authorizing the search of the computers in their possession for child pornography and counterfeiting evidence. Even without the serial numbers, the warrants would not have permitted a general exploratory rummaging through Defendant's belongings for evidence of criminal activity. They were, rather, limited to the computers already in possession of the agents, and were limited to subject matters for which there was a probable cause to believe evidence of criminal activity might exist.

60.     Defendant argues that the evidence regarding Defendant's telephone conversation with his mother from the Allegheny County Jail was only obtained by exploitation of the original seizure of the computers. Although the seizure may have indirectly prompted the telephone call between Carter and his mother on the following day (information which was included in the application for a search warrant) the seizure of the computers did not compel Carter to incriminate himself on the phone. Carter's self-incriminating statement was the result of a voluntary decision to reassure his mother, not police exploitation of the seized computers. Applying the fruit of the poisonous tree doctrine here, this evidence would not be excluded, <u>see United States v. Budd</u>, 549 F.3d 1140, 1144 (7th Cir. 2008) (affirming district court decision not to exclude incriminating statements made by a defendant following a presumptively illegal seizure of a computer where the statements were but-for caused by the seizure, but were made voluntarily), and need not be excised under the two-part <u>Stabile</u> test. Even assuming, *arguendo*,

24

that conversation was not sufficiently attenuated from the seizure, there was still sufficient probable cause (excising the arguably tainted evidence) in the application for the magistrate to issue the warrant.  See United States v. Price, 558, F.3d 270, 280-82 (3d Cir. 2009) (holding that evidence obtained as a result of a warrant search should not be excluded even though the warrant application contained information obtained during an illegal consent search, where the other information in the warrant application, not derived from the illegal search, was independently sufficient to support a finding of probable cause).  Here, the evidence relating to Defendant's history of counterfeiting, his possession of counterfeit gift certificates and currency, which were created using a computer program, as well as the statement from Kennedy that she saw what appeared to be a counterfeit gift certificate near Carter's computers, is independently sufficient to support a finding of probable cause.  The second and third warrant applications were obtained with evidence that was in plain sight during a valid warrant search, and did not include any illegally obtained evidence.  Under these circumstances, the answer to the first question with respect to the three warrants is "yes."  See Stabile, 633 F.3d at 244.

**Did the initial seizure of the computers prompt the agents to obtain the warrant?**

61.     The answer to the second question asked in Stabile—whether the first search prompted the officers to obtain the subsequent search warrant—is "no."  On the night *before* the presumptively illegal seizure, Radens began preparing to apply for a search warrant.  Radens took notes in preparation for preparing an affidavit, and when he believed that he would not obtain consent to seize the computers, he took steps to obtain a warrant.  None of the reasons for obtaining the first warrant are in any way related to the presumptively illegal seizure of the computers, and it is clear from Radens's testimony, which this court credits, that his intent to obtain a warrant was the result of a careful and licit investigation of Carter's alleged

counterfeiting activity. Radens's decision to apply for the warrant was not prompted by any new evidence obtained as a result of the seizure. He decided to leave the Carter home to apply for a warrant before the seizure actually occurred. The decisions to obtain the second and third warrants were equally insulated from any evidence obtained as a result of the presumptively illegal seizure. Instead, the agents applied for the successive warrants because they uncovered evidence of child pornography on the first computer searched.

62. Because the answer to the first question in <u>Stabile</u> is "yes," and the answer to the second question is "no," the evidence obtained from Carter's computers is excepted from the exclusionary rule by virtue of the independent source doctrine. The motion to suppress on fruit-of-the-poisonous tree grounds must, therefore, be denied.

63. Because the independent source doctrine applies to the disputed evidence, the warrants were supported by probable cause, and the supporting affidavit for each of the three warrants contained no material omission or materially false statements, Carter's motion to suppress (ECF No. 52) must be denied.

## III. Order

AND NOW, this 24th day of February 2012, upon consideration of the parties' filings, the arguments made by counsel at the suppression hearing on September 16, 2011, the testimony of witnesses and the evidence introduced at that hearing, IT IS HEREBY ORDERED that, in accordance with the findings of fact and conclusions of law filed herewith, Defendant's motion to suppress (ECF No. 52) is DENIED.

By the court,

 /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge